UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CONSOLIDATED METCO, INC. AND SHANDONG CONMET MECHANICAL CO., LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Court No. 25-00208<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiffs Consolidated Metco, Inc. ("ConMet") and Shandong ConMet Mechanical Co, Ltd. ("Shandong ConMet"), by and through their attorneys, allege and state as follows:

### DETERMINATION CONTESTED

1.     Plaintiffs seek judicial review of the final determination issued by the United States Department of Commerce ("Commerce") in the antidumping duty investigation of certain brake drums from the People's Republic of China. *See Certain Brake Drums From People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025) ("Final Determination"). The final determination covers a period of investigation from October 1, 2023, through March 31, 2024. The determinations, findings, and conclusions are set out primarily in the accompanying Issues and Decision Memorandum. *See* Memorandum from Scot Fullerton to Steven Presing, *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China* (Dep't Commerce June 13, 2025) ("Final I&D Memo").

1

2.	Following final affirmative injury determinations by the U.S. International Trade Commission ("ITC"), Commerce published an antidumping order in the Federal Register on August 12, 2025.  *See Certain Brake Drums From the People's Republic of China and the Republic of Türkiye: Antidumping Duty Orders*, 90 Fed. Reg. 38,730 (Aug. 12, 2025) ("AD Order").

3.	Plaintiffs bring this action to contest certain aspects of the Final Determination issued by Commerce that are not supported by substantial evidence and are otherwise not in accordance with law.

## JURISDICTION

4.	This action was commenced pursuant to 19 U.S.C. §§ 1516a(a)(2)(B)(i) to contest the Final Determination issued by Commerce in the antidumping duty investigation on imports of certain brake drums from the People's Republic of China.

5.	Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1581(c), which provides that this Court has exclusive jurisdiction over civil actions commenced under section 516A of the Tariff Act of 1930, and section 516A(a)(2)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(a)(2)(B)(i), which provides that final determinations in investigations by Commerce are reviewable.

## STANDING

6.	Shandong ConMet is a foreign producer and exporter of subject merchandise and is therefore an interested party within the meaning of 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3), and 28 U.S.C. § 2631(k)(1).  ConMet is a U.S. importer of subject merchandise and is therefore an interested party within the meaning of 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3), and 28 U.S.C. § 2631(k)(1).

7.      Shandong ConMet and ConMet participated, through the submission of both factual information and legal argumentation, in the investigation that gave rise to the contested Final Determination. Shandong ConMet and ConMet were therefore "part{ies} to the proceeding" and are entitled to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## **TIMELINESS OF THIS ACTION**

8.      Commerce published the AD Order in the Federal Register on August 12, 2025. *See* AD Order, 90 Fed. Reg. at 38,730.

9.      This action was commenced with the filing of the Summons on September 11, 2025, within 30 days of publication of the AD Order. Accordingly, this action was commenced within the period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II).

10.     This Complaint is filed within 30 days of the filing of the Summons in this action and is therefore timely under the statutorily prescribed time limits set forth in 19 U.S.C. § 1516(a)(2)(A).

## **PROCEDURAL HISTORY**

11.     On June 20, 2024, Webb Wheel Products, Inc. ("Webb Wheel") filed a petition to Commerce and the ITC, seeking the imposition of antidumping and countervailing duties on U.S. imports of certain brake drums from the People's Republic of China ("China") and the Republic of Türkiye ("Turkey"). *See Petition for the Imposition of Antidumping and Countervailing Duties on Imports of Certain Brake Drums from the People's Republic of China and Türkiye* (June 20, 2024).

12.     On July 10, 2024, Commerce initiated the antidumping duty investigations of brake drums from China and Turkey, notice of which was published on July 17, 2024. *See Certain*

3

*Brake Drums From the People's Republic of China and the Republic of Türkiye: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 58,116 (July 17, 2025). Commerce's antidumping investigation of brake drums form China covered a period of investigation ("POI") from October 1, 2023, through March 31, 2024.

13.     On August 5, 2024, the ITC preliminarily determined that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of brake drums from China and Turkey. *See Brake Drums from China and Turkey*, 89 Fed. Reg. 65,397 (Aug. 9, 2024).

14.     On August 26, 2024, Commerce selected Shandong ConMet for individual examination in the antidumping duty investigation regarding China and issued an initial questionnaire to Shandong ConMet.[1] Memorandum from Samuel Frost through Kabir Archuletta to Scot Fullerton, *Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China: Respondent Selection* (Dep't Commerce Aug. 26, 2024). From September 2024 through January 2025, Shandong ConMet submitted timely responses to the questionnaire, responses to supplemental questionnaires issued by Commerce, and factual information to value Shandong ConMet's factors of production. The responses included information and data concerning sales of subject merchandise to the United States through Shandong ConMet's affiliated U.S. importer, ConMet.

---

[1] Commerce selected a second mandatory respondent, Caiec Trailer, for individual examination in the antidumping duty investigation. However, Caiec Trailer withdrew its participation in the proceeding. Memorandum from Samuel Frost through Shawn Thompson to Scot Fullerton, *Antidumping Duty Investigation of Certain Brake Drums from the People's Republic of China: Selection of Additional Respondent* (Dep't Commerce Sept. 17, 2024). Subsequently, Commerce selected Shandong Longji as a mandatory respondent, but Shandong Longji withdrew its participation in the proceeding as well. Letter from Craven Trade Law LLC to Sec'y of Commerce, *Brake Drums from the People's Republic of China A-570-176; Notification of Withdrawal of Participation* (Oct. 15, 2024). This left Shandong ConMet as the only company subject to individual examination.

15. When responding to Commerce questionnaires regarding its factors of production, Shandong ConMet reported the value of cast iron used in the production process for brake drums. Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Response to Section D of the Department's Initial Questionnaire* (Oct. 17, 2024). Shandong ConMet explained that some of the cast iron used in the production process was treated as scrap, then subsequently reintroduced into future production runs, thereby reducing the amount of raw material that Shandong ConMet would otherwise need to purchase in order to manufacture subject merchandise. *Id*. at 17. To ensure detailed and accurate reporting, Shandong ConMet reported the initial amount of cast iron used in the production process and reported the scrap cast iron that was removed from and reintroduced to the production process as a negative amount, thereby reflecting the net amount of scrap iron that it actually needed to purchase for its production of subject merchandise. *Id.* at 17.

16. On January 29, 2025, Commerce published its Preliminary Determination in the Federal Register. *See Certain Brake Drums from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 89 Fed. Reg. 5821 (Jan. 29, 2025). ("Preliminary Determination"). Commerce preliminarily determined that certain brake drums from China were being, or were likely to be, sold in the United States at less than fair value. Commerce calculated a weighted-average dumping margin of 109.64 percent for Shandong ConMet. *Id*. at 8384. Other non-examined companies were also determined to have a weighted-average dumping margin of 109.64 percent. *Id*. The China-Wide Entity, consisting of companies that failed to demonstrate that they operate without control by the Chinese government, was determined to have a weighted-average dumping margin of 160.79 percent. *Id*.

17. In the Decision Memorandum accompanying the Preliminary Determination, Commerce explained the basis for Shandong ConMet's preliminary dumping margin. *See* Memorandum from Scot Fullerton to Abdelali Elouaradia, *Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China* (Dep't Commerce Jan. 23, 2025). Commerce selected Turkey as the primary surrogate country to value Shandong ConMet's factors of production. *Id.* at 9. To value Shandong ConMet's inland freight, Commerce declined to rely on contemporaneous, public truck freight rates in Turkey published by Turkish transportation provider, Hapag-Lloyd. *Id*. at 24-25. Instead, Commerce relied on data from the 2020 version of the World Bank *Doing Business – Turkey* report to value both inland freight and brokerage and handling expenses. *Id*. at 25. Commerce adjusted these figures, which were originally collected in Turkish lira then converted to U.S. dollars for publication in *Doing Business – Turkey*, by applying an inflator based on changes to the value of Turkish lira from when the data were collected through the period of investigation to the USD-denominated values. *Id*. at 25. Regarding Shandong ConMet's scrap iron that was reintroduced into production, Commerce treated the negative values as a reduction in direct material inputs, thereby treating the scrap iron reintroduced as an offset to the cost of manufacturing. *See* Memorandum from Samuel Frost to the File, *Preliminary Analysis Memorandum for Shandong ConMet Mechanical Co., Ltd.* (Dep't Commerce Jan. 23, 2025) at 5-7, Attach. 1.

18. On May 15, 2025, Shandong ConMet filed its case brief. *See* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Shandong ConMet's Case Brief* (May 15, 2025). In its case brief, in relevant part,

Shandong ConMet argued that Commerce should revise its surrogate value for inland freight and brokerage and handling expenses. *Id*. at 15-26.

19.     On May 22, 2025, Shandong ConMet filed a rebuttal brief responding to arguments raised in Webb Wheel's case brief. *See* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Shandong ConMet's Rebuttal Brief* (May 22, 2025). In its rebuttal brief, Shandong ConMet argued that Commerce should, in its Final Determination, reject several of Webb Wheel's arguments and calculations. *Id*. In relevant part, Shandong ConMet argued that Commerce had correctly classified certain recycled scrap iron as an offset to its direct materials consumption in the Preliminary Determination, and that Commerce should not reclassify these materials. *Id*. at 26-27.

20.     On June 18, 2025, Commerce published its Final Determination in the Federal Register. *Certain Brake Drums From People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025). In the Final Determination, Commerce made several adjustments to its preliminary calculations. For example, Commerce removed the inflator from the calculation of the electricity surrogate value, recalculated the insurance surrogate value, and revised the aberrationally high surrogate value for Shandong ConMet's recarburizing agent, all of which reduced the dumping margin calculated for Shandong ConMet. Final I&D Memo at Comments 3, 5, and 12. In addition, however, Commerce also revised its treatment of Shandong ConMet's reintroduced cast iron scrap such that it was an offset to normal value instead of direct materials, which increased the dumping margin calculated for Shandong ConMet from what it otherwise would have been. *Id*. at Comment 15. Meanwhile, despite ConMet's arguments to the contrary, Commerce did not revise other aspects of the Preliminary Determination, including the use of the World Bank's *Doing Business – Turkey* report

to value inland freight and the inflator applied to the World Bank's *Doing Business – Turkey* report values for inland freight and brokerage and handling. *Id*. at Comment 2. The ultimate result was to reduce in the Final Determination the weighted-average dumping margin for Shandong ConMet (and other non-examined companies) from 109.64 percent to 77.14 percent – lower, but still much higher than it should have been if Commerce had followed the law and issued a determination supported by substantial evidence. *See* 90 Fed. Reg. 26,011. The China-Wide Entity weighted-average dumping margin remained the same at 160.79 percent. *Id*.

21.   On July 16, 2025, the ITC voted affirmatively, finding that that an industry in the United States was materially injured by reason of imports of brake drums from China and Turkey, and it published notice of its determinations on August 7, 2025. *See Brake Drums From China and Turkey; Determinations*, 90 Fed. Reg. 38,179 (Aug. 7, 2024).

22.   On August 12, 2025, Commerce published the AD Order.

## STATEMENT OF CLAIMS

23.   In the following respects, and for other reasons apparent from the administrative record of Commerce's investigation of brake drums from the People's Republic of China, the Final Determination is unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT ONE

24.   Paragraphs 1 through 23 are hereby incorporated by reference.

25.   In the Final Determination, Commerce calculated the surrogate value for inland freight using data from the World Bank's *Doing Business – Turkey* report. In doing so, Commerce ignored that the *Doing Business – Turkey* report's data are not a contemporaneous or otherwise appropriate source for calculating surrogate values and declined to use several more appropriate

8

alternative and contemporaneous sources of data on the record. When evaluating surrogate value data, Commerce considers several criteria, including whether the surrogate value data are publicly available, contemporaneous with the period under consideration, broad-market averages, tax- and duty-exclusive, and specific to the inputs being valued. *See* Final I&D Memo at Comment 2. Commerce's preference is to satisfy the breadth of these selection criteria. *See id*.

26.     Commerce erred in relying on the World Bank's *Doing Business – Turkey* report because *Doing Business – Turkey* report's data do not meet several of Commerce's criteria. First, the *Doing Business – Turkey* report was from 2020, and the data collection occurred in 2019, meaning that the report was already several years old at the time of the POI. Moreover, the *Doing Business – Turkey* data were not specific to truck freight, which is the primary focus of this inland freight calculation, making the data not specific to the inputs being valued. As such, the *Doing Business – Turkey* data do not meet several of the criteria that Commerce considers when determining which data to use to calculate surrogate value.

27.     In addition, the *Doing Business – Turkey* report's data are inappropriate for selection to calculate the inland freight surrogate value because they led to unreasonably high values, which Commerce is required to not use to value factors of production. While there is no bright-line standard for what makes a value "aberrational," the *Doing Business – Turkey* report's data used in the Final Determination led to a surrogate value that was many times higher than alternative sources on the record, including those that were more contemporaneous, more specific to truck freight, and more reflective of broad market averages. The data led to a surrogate value nearly 20 times higher than truck rates using alternative data in Turkey, more than 20 times higher than the truck rate that was being

offered by a comparable company in Malaysia, and more than 10 times higher than the truck rates used by Shandong ConMet in Mexico during the POI. *See Brake Drums from the People's Republic of China: Shandong ConMet's Case Brief* (May 15, 2025). The Court has previously determined that Commerce's use of surrogate values that are many times higher than alternative sources on the record is unsupported by record evidence and otherwise not in accordance with law. *See, e.g., Hebei Metals & Minerals Import & Export Corporation v. United States*, 28 CIT 1185 (2004) (requiring Commerce to exclude certain imports from the surrogate value AUV because the prices were significantly higher than the average price from all other countries); *Jacobi Carbons Ab, Jacobi Carbons, Inc. v. United States, Calgon Carbon Corp.*, 619 F. App'x 992 (Fed. Cir. 2015) (indicating that prices that are 15 times higher than prices in other comparable countries are aberrational); *Catfish Farmers of America v. United States*, 641 F. Supp. 2d 1362, 1367 (Ct. Int'l Trade 2009) (excluding certain data points from a surrogate value import dataset because they represented aberrational high prices).

28. Moreover, the relative consistency of other data sources on the record with each other and the fact that several of those sources better met Commerce's criteria for surrogate values demonstrate that alternative record sources would have more accurately valued Shandong ConMet's cost of production and movement expenses. *See Brake Drums from the People's Republic of China: Shandong ConMet's Case Brief* (May 15, 2025).

29. Commerce's determination that the data from the World Bank's *Doing Business – Turkey* report were the best available data on the record for purposes of valuing Shandong ConMet's surrogate value for inland freight expenses was therefore unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT TWO

30. Paragraphs 1 through 29 are hereby incorporated by reference.

31. In the Final Determination, Commerce adjusted the calculated surrogate value for inland freight for inflation because the *Doing Business – Turkey* report's data were not contemporaneous with the POI. The World Bank's *Doing Business – Turkey* report relied on data for expenses incurred in Turkish lira that had been converted from Turkish lira to U.S. dollars using an exchange rate that was contemporaneous with the collection of data in May 2019.

32. However, instead of converting the values back to Turkish lira before applying the Turkish lira-based inflator, or applying an inflator based on USD inflation to the USD-denominated values, Commerce erroneously applied an inflator based on inflation of Turkish lira to values denominated in U.S. dollars. Because the Turkish lira has become significantly devalued relative to the U.S. dollar since 2019 as a result of hyperinflation with respect to the lira, Commerce's decision yielded a significantly higher value than applying the same inflator to a 2019 Turkish lira value, then converting to USD based on an exchange rate during the POI. As a result of the improper application of the inflator, the surrogate value for inland freight is aberrationally high and does not accurately value Shandong ConMet's cost of production and movement expenses.

33. Therefore, Commerce's determination with respect to the inflator for the purposes of valuing Shandong ConMet's surrogate value for inland freight expenses was unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT THREE

34. Paragraphs 1 through 33 are hereby incorporated by reference.

35.	In the Final Determination, Commerce calculated the surrogate values for brokerage and handling expenses using data from the World Bank's *Doing Business – Turkey* report, which Commerce adjusted for inflation in Turkey because the data were not contemporaneous with the POI.  The World Bank's *Doing Business – Turkey* report relied on data for expenses incurred in Turkish lira that had been converted from Turkish lira to U.S. dollars using an exchange rate that was contemporaneous with the collection of data in May 2019.

36.	Similar to Count 2, Commerce applied an inflator based on Turkish lira to values in U.S. dollars, instead of converting the USD values to lira before applying the inflator.  Because of high inflation in Turkey since 2019, one USD would buy several times more Turkish lira in the POI than it did in May 2019.  As a result, Commerce's decision yielded a significantly higher value than applying the same inflator to a 2019 Turkish lira value, then converting to USD based on an exchange rate during the POI, rendering the surrogate value for brokerage and handling expenses inaccurate and aberrantly high.

37.	Therefore, Commerce's determination to apply an inflator for the purposes of valuing Shandong ConMet's surrogate value for brokerage and handling expenses was unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT FOUR

38.	Paragraphs 1 through 37 are hereby incorporated by reference.

39.	In the Final Determination, Commerce classified Shandong ConMet's scrap cast iron as a byproduct, rather than as a direct material.  Commerce's decision is inconsistent with its longstanding practice, in which it classifies scrap metals as direct materials if they are reintroduced into the production process, but not if they are sold to third parties.  *See, e.g., Cast Iron Soil Pipe Fittings From the People's Republic of China: Final Affirmative Determination of*

*Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 Fed. Reg. 33,205 (July 17, 2018).

40. Moreover, Commerce's reclassification of scrap cast iron is erroneous because Shandong ConMet's scrap cast iron is not sold as a byproduct for which a byproduct offset would be appropriate; rather, it is reused in the production process as a recycled input product. The reintroduced scrap cast iron reduces the quantity of cast iron that Shandong ConMet would otherwise need to purchase in order to manufacture subject merchandise. This, in turn, directly affects the cost of production. By classifying these recycled inputs as byproducts instead of direct materials, Commerce's Final Determination does not reflect Shandong ConMet's commercial reality, not does it accurately value Shandong ConMet's cost of production.

41. Commerce's determination to classify Shandong ConMet's scrap cast iron fields as byproducts, instead of direct materials, was unsupported by substantial evidence and otherwise not in accordance with law.

## **DEMAND FOR JUDGMENT AND RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

42. Hold that the portions of Commerce's Final Determination described herein are not supported by substantial evidence on the record and are otherwise not in accordance with law;

43. Remand this matter for Commerce to issue a determination consistent with the final opinion and order of this Court; and

44. Provide such further relief as this Court deems just and proper.

    Respectfully submitted,

    /s/ Matthew R. Nicely
    Matthew R. Nicely

Daniel M. Witkowski  
Julia K. Eppard  
Paul S. Bettencourt  
Sung Un K. Kim  
**AKIN GUMP STRAUSS HAUER & FELD LLP**  
2001 K St NW  
Washington, D.C. 20006  
Tel: (202) 887-4046  
*Counsel for Plaintiffs*

Dated: October 10, 2025